APPROVED FOR PUBLIC
FILING BY CSO

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ZIYAD BIN SALIH BIN MUHAMMAD      AL-BAHOOTH, <br><br> Petitioner, <br><br> v. <br><br> GEORGE W. BUSH, *et al.,* <br><br> Respondents. | ) <br> ) <br> ) <br> ) <br> )    **Civil Action No. 05-CV-1666** <br> )    **(ESH)** <br> ) <br> ) <br> ) <br> ) |

### PETITIONER'S RESPONSE TO RESPONDENTS' MOTION FOR
### PROCEDURES RELATED TO REVIEW OF CERTAIN DETAINEE MATERIALS

Petitioner, by his counsel, respectfully submits this response to Respondents' Motion for Procedures Related To Review Of Certain Detainee Materials ("Emergency Motion").

The law firm of Jenner & Block represents the petitioner in this case and we are doing so on a pro bono basis. As the Court knows, our client has been held in prison at Guantánamo Bay, Cuba for more than 4½ years with no charges of any kind placed against him. The four Jenner & Block partners working on this matter collectively have been practicing law for more than 130 years. Never in our experience have we confronted more difficult barriers to establishing the kind of trust and confidence necessary for a meaningful attorney-client relationship. Some of the barriers are related to geographic location, language and culture. But, for 4½ years, our government – the Respondents here – has done just about everything possible to impede and frustrate the establishment and development of the attorney-client relationship.

Now, Respondents acknowledge in the Emergency Motion they filed on July 7, 2006 that, three weeks earlier, the Naval Criminal Investigative Service ("NCIS") unilaterally and without prior notice confiscated every document – including attorney-client privileged

documents – in the possession of every single prisoner at Guantánamo except for three prisoners who have been designated as non-enemy combatants. Emergency Mot. at 6. According to Respondents, NCIS confiscated 1,100 pounds of documents in the course of investigating the deaths of three prisoners on June 10, 2006. *Id.* The Emergency Motion makes clear that Respondents have read and reviewed at least a portion of these documents, *id.* at 7, and Respondents now request that the Court authorize further review of the confiscated documents by a "Filter Team" composed of Department of Justice lawyers. *Id.* at 10. Respondents do not suggest <u>any</u> basis for believing that our client possesses documents relevant to the NCIS investigation. Nor do they suggest when, if ever, they intend to return privileged and confidential materials that belong to our client.

For the reasons set forth in this response, the Respondents' motion should be denied.

## <u>STATEMENT OF FACTS</u>

1.    In its Emergency Motion, the government sets forth the following alleged facts: on June 10, 2006, three prisoners at Guantánamo were found dead in their cells, and JTF reported that the men had committed suicide. Emergency Mot. at 3. The NCIS began an investigation, starting with searches of the cells of the deceased prisoners. *Id.* at 5. After discovering one handwritten note on notepaper marked as attorney-client privileged, NCIS investigators expanded their search to all of the other occupied cells in the same cell block as the deceased prisoners for "additional evidence regarding the circumstances of the deaths of the three detainees." *Id.* This broader search yielded the discovery of handwritten Arabic notes, potentially authored by at least two of the deceased men, which the NCIS translated, reviewed and identified as relevant to the investigation. *Id.* at 6. Based on the discovery of these notes, and without notifying any habeas counsel, the NCIS confiscated all of the Guantánamo

prisoners' legal materials on June 14, 2006 as well as the few letters and photos that the prisoners were permitted to receive from their families in their years of imprisonment. *Id.*

The NCIS then reviewed the materials of eleven prisoners. *Id.* at 7. The NCIS search of one prisoner's materials revealed a document containing instructions on tying knots, which apparently was neither on paper marked as attorney-client nor in the prisoner's legal folder. *Id.* The NCIS also found a JTF-Guantánamo generated e-mail containing information regarding cell locations of prisoners and other details regarding camp operational matters *Id.* The NCIS then searched all of the materials of this prisoner, including in three envelopes marked attorney-client privileged, and found materials with unclassified and "FOUO" designations. *Id.* Although one of these documents bore a "Secret" classification, this marking was lined out and marked "Unclassified." *Id.* Respondents maintain that the NCIS did not read any of these latter materials but merely scanned them. *Id.*

2.      On June 27, Jenner & Block learned that, according to the chief attorney for the SJA, all legal materials had been confiscated from every Guantánamo prisoner. Declaration of Patricia A. Bronte, attached as Exhibit A. On June 28, 2006, Jenner & Block sent a letter to Respondents' attorneys outlining our concerns about the general confiscation of prisoners' legal materials and seeking adequate assurances that Respondents would comply with the Protective Order. We requested that Respondents confirm immediately that our clients' attorney-client materials would be returned to them, without any review by NCIS, SJA, or other U.S. military or civilian personnel. To the extent any review had already occurred, we asked Respondents to provide the particulars of which personnel reviewed which particular document and the date and time of the review as well as to provide assurances that any information gained from such review would be maintained as confidential and not disclosed to any other person or entity. A copy of

the June 28 letter is attached as Exhibit B.  On June 29, Respondents' attorneys told us that Respondents would respond to Ms. Bronte's June 28 letter about the general confiscation of legal materials within a few days.  A copy of the June 29 letter is attached as Exhibit C.

3.    On June 30, Terry Henry of the Department of Justice notified all habeas counsel that "on or about June 14, 2006, documents of all detainees classified as enemy combatants, including legal mail," were confiscated for the purposes of investigation.  A copy of this communication is attached as Exhibit D.  This was Respondents' first notice to counsel that Respondents had unilaterally confiscated all prisoners' privileged documents.  On July 7, 2006, Respondents filed the Emergency Motion giving this Court formal notice of its unilateral decision to confiscate all prisoners' legal materials.

## **ARGUMENT**

### A.    *Respondents Fail To Demonstrate Any Valid Basis For Confiscating or Reviewing Our Client's Papers.*

Respondents confiscated all the prisoners' documents and then decided to review some of these documents without consulting this Court or alerting habeas counsel.  Respondents' "basis" for the confiscation of all of the prisoners' legal materials, including our client's materials, rests in the purported discovery of notes on paper bearing an attorney-client designation that were discovered when NCIS searched the cells of prisoners in the same cell block as the deceased individuals.   Neither of these notes is related in any way to the Petitioner before this Court, and Respondents do not suggest otherwise.  Nevertheless, Respondents claim that these notes justify the confiscation of all of the legal materials of our client.  The government's assertion is baseless.  The American Bar Association has called for an investigation of the military's breach of the attorney-client privilege.  This letter is attached as Exhibit E.

The first two notes NCIS allegedly discovered did not implicate any abuse of the attorney-client privilege. The document on knot tying was not written on attorney-client paper or kept with the prisoner's legal materials, and the JTF email could not possibly have been given to the prisoner by habeas counsel as habeas counsel lacks access to such documents. Neither document raises any concerns about the use of the attorney-client privilege by anyone – let alone the petitioner before this Court. However, it was based on these documents that the NCIS decided to invade the attorney-client privilege by reviewing that prisoner's legal materials. The Respondents further contend that the NCIS's subsequent discovery of commingled privileged and non privileged materials by an additional prisoner – again, not the Petitioner as far as Respondents have asserted – justifies the continued impounding of our client's legal materials and the review of each and every page of these documents "to prevent any additional loss of life and ensure the safety of detainees and military personnel at Guantánamo." *Id.* at 8.

Although Respondents recognize the attorney-client privilege issues raised by their actions, consistent with their actions over the past 4½ years, Respondents did not hesitate to take the law into their own hands. The Respondents seized and examined privileged communications over an eight-day period, without court approval or supervision, and without prior notice or even contemporaneous notice to the prisoners' counsel. The length of time devoted to this review suggests that no exigent circumstances required the Respondents to act without first seeking approval from the Court and notifying habeas counsel. More than three weeks after their self-help, the Respondents finally decided it was time to alert this Court of their confiscation of all prisoners' legal materials.

Respondents hope to identify documents that "may be relevant to investigation of the complete circumstances of the recent suicides." Emergency Mot. at 15. Respondents also want

to discover "the existence of any other plots or plans for additional detainee suicides." *Id.* Respondents state that prison officials are authorized to search prison quarters in order to mitigate and address potential threats to the security of detention facilities and to the safety of personnel and detainees in those facilities. *Id.* at 14.

It is well-established that incarcerated or detained individuals do not forfeit the attorney-client privilege upon detention. *United States v. Defonte*, 441 F.3d 92, 94 (2d Cir. 2006). The right to this privilege does not diminish when the clients stand accused of terrorism charges that implicate national security. For instance, in *Lonegan v. Hasty*, 2006 WL 1707258 (E.D.N.Y. June 22, 2006), the court found that a terrorism suspect and his attorney had a "constitutionally protected reasonable expectation of privacy in their communications." *Id.* at *18. And here, petitioner has not even been charged with a crime.

Recognizing and protecting the attorney-client privilege of prisoners, courts have acted with "heightened concern" when prison officials open and read mail that "has import for . . . the attorney-client privilege." *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003). Although courts have approved prison policies that allow prison officials "to open legal mail and inspect it for contraband in the presence of the prisoner," courts have specified that the mail "can be opened (*although not read*) and inspected for contraband." *Id.* (emphasis added). Other courts have allowed the scanning of legal materials and have described scanning as "looking for drugs and physical contraband under the staples and in the pages, and looking at the title names of documents." *Evans v. Vare*, 402 F. Supp. 2d 1188, 1192 n. 1 (D. Nev. 2005). Besides protecting legal mail, the Second Circuit has stated that prisoners' notes or "an outline of what a client wishes to discuss with counsel – and which is subsequently discussed with one's counsel –

would [also] seem to fit squarely within our understanding of the scope of the [attorney-client] privilege." *Defonte*, 441 F.3d at 96.

None of the cases cited by Respondents to justify their substantive review of prisoners' materials involved the wholesale search of attorney-client privileged documents.    Rather, the searches in the cases cited by Respondents were searches for contraband and did not involve any review of written materials.    *Bell v. Wolfish*, 441 U.S. 520, 555-557 (1979) (search for contraband); *Hudson v. Reno*, 458 U.S. 517, 527 (1984) (search for drugs or contraband); *Block v. Rutherford*, 468 U.S. 576, 589-592 (1984) (search of prisoner's cell conducted without presence of prisoner).    These cases, therefore, do not support Respondents' deliberate intrusion on the attorney-client privilege.

Respondents also assert that the attorney-client privilege does not apply to communications made in furtherance of committing a crime or tort and that the attorney-client privilege only applies to privileged communications made for purposes of litigating this case. Emergency Mot. at 16, citing to *United States v. Zolin*, 491 U.S. 554, 562-63 (1989) and *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982).[1]    However, the rule endorsed by the Supreme Court in *Zolin* would not allow the massive fishing expedition Respondents request here. In *Zolin*, the Supreme Court allowed an *in camera* judicial review of the materials to determine the applicability of the crime-fraud exception only after the judge required "a showing of a factual basis adequate to support a good faith belief by a reasonable person . . . that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud

---

[1] *United States v. Jones* does not support Respondents' invasion of the privilege.  In *Jones*, the court doubted whether the attorney-client privilege ever applied to the materials and noted that if the privilege applied, it was waived by the client when its business publicized the legal opinions received.  *Id.* at 1073.  *Jones*, therefore, supports the proposition that the attorney-client privilege can be waived by the client's disclosure.  No such disclosure has been made by our client.

exception applies." *Id.* at 572. Here, however, Respondents fail to show any basis for believing that our client has the intention of committing a crime or tort, and the review was conducted by Respondents' agents, not an independent judicial officer.

Respondents' justification for the confiscation and review of the material is based on gross speculation and would not support a good faith belief by a reasonable person that our client has knowledge of the past suicides or future suicides and/or disturbances. Absent individualized proof of our client's proximity and relationship with the deceased individuals, Respondents' hope of identifying documents relevant to the recent suicides is too tenuous to support the confiscation and review of legal materials. The Emergency Motion cites no reason to believe that our client possesses any documents pertaining to the three decedents.

Similarly, Respondents have not made any individualized showing that our client commingled any of his privileged materials with other documents. For instance, Respondents state that some of the confiscated material was written on paper stamped "attorney-client privilege." Jenner & Block did provide our client with blank pads of paper, but these papers bore no stamp. Declaration of Maya D. Nath at ¶3, attached as Exhibit F. Therefore, it is highly improbable that our client has made non-privileged notes on papers designated as attorney-client privileged. Anecdotal evidence that some unidentified prisoners may have commingled their privileged and non-privileged documents does not justify an assumption that all prisoners did so.

Respondents also state that they located two sets of notes in two different prisoner's cells that related to the suicides. Respondents clearly know which prisoners possessed the notes. Although a search of those prisoners' belongings may have had some rational basis, Respondents offer no reason for suspecting that our client has been harboring passed notes or has passed notes himself relating to the three deaths, much less that he has done so under the guise of the attorney-

client privilege.  The government has operated on a guilt by association theory in holding many men at Guantanamo for more than 4½ years with no charges.  Our courts continue to reject the government's approach.  Now, this Court should reject the government's effort to use guilt by association to support a trespass on the time-honored attorney-client privilege.

Respondents express a desire to prevent additional suicides and disturbances in the camps.  Although some prisoners may have suicidal tendencies due to the conditions of their prolonged and indefinite imprisonment, Respondents' actions in confiscating legal materials have only exacerbated those conditions.

**B.      *Respondents' Proposal Of A Filter Team Should Be Denied.***

Respondents claim that the use of filter teams for review of attorney-client materials has been recognized and sanctioned in other contexts, namely in the review of attorney-client materials seized by law enforcement officials pursuant to search warrants.  Emergency Mot. at 19.  Here, however, Respondents seized the legal materials of approximately 450 prisoners without any warrant or showing of probable cause.  Moreover, as Respondents recognize, some courts have rejected the use of filter teams because of the filter team's potential use of information in criminal cases.  *Id*. at 21, citing *United States v. Stewart*, 2002 WL 1300059 (S.D.N.Y. 2002).  Although it may lessen the burden on Respondents to use a filter team, we submit it is inappropriate to have team members associated with, employed by, and beholden to the Respondents.

Although Jenner & Block vigorously contests the justification and need for the review of our client's legal materials, to the extent that the government can make a specific, individualized showing that a particular prisoner has used his attorney-client materials for illegal ends, the Court at most should order that prisoner's documents to be reviewed *in camera* by a judge, in the

presence of habeas counsel and without government lawyers. This procedure would reduce the appearance of impropriety and relieve some of our client's concern about sharing his privileged papers with a party who is not his legal representative.

Moreover, to the extent that the documents have been reviewed, Respondents bear the burden to rebut the presumption that the material was provided to the prosecution team. As stated by Judge Green in *United States v. Neill*, 952 F. Supp. 834 (D.D.C. 1997), "[w]here the government chooses to take matters into its own hands rather than using the more traditional alternatives of submitting disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special masters, . . . it bears the burden to rebut the presumption that tainted material was provided to the prosecution team." *Id.* at 841 (citations omitted).

Jenner & Block also urges this Court to reject Respondents' proposal that the filter team be allowed to conduct its own review of the confiscated documents to determine whether they were properly "privileged" in nature, whether or not the documents are relevant to the NCIS suicide-plot investigation. Emergency Mot. at 10. If the filter team determines that the documents are not privileged, Respondents propose, then they will be "returned . . . to JTF-Guantánamo for appropriate action." *Id.* at 11. Respondents suggest that "possibly others" may have participated in a "manifest abuse of the legal mail system." *Id.* at 10. The undersigned attorneys at Jenner & Block already (a) submit all legal materials to the Privilege Team for review prior to sending to them to the Petitioner, (b) meet the requirements for security clearance, and (c) abide by the obligations of the Protective Order. As officers of the Court, Jenner & Block respectfully sees no need for an additional review of our correspondence with our client.

## CONCLUSION

For the reasons set forth herein, this Court should deny Respondents' Emergency Motion For Procedures Related To Review Of Certain Detainee Materials and order Respondents to:  (1) return to Petitioner all legal mail or privileged communication confiscated or withheld from him; (2) within 5 days of the Order, file a declaration under oath by a person with actual knowledge describing the full particulars of what has been done with any privileged communication or legal mail confiscated from Petitioner.

Respectfully submitted,

/s/ David W. DeBruin
One of the Attorneys for the Petitioner          Dated: July 20, 2006

Thomas P. Sullivan                      David W. DeBruin (DDC Bar No. 337626)
Jeffrey D. Colman                       JENNER & BLOCK LLP
David J. Bradford                       601 Thirteenth Street, N.W., Suite 1200
Patricia A. Bronte                      Washington, D.C.  20005-3823
Maya D. Nath                            Tel: (202) 639-6000
JENNER & BLOCK LLP                      Fax: (202) 639-6066
One IBM Plaza
Chicago, IL  60611
Tel: (312) 222-9350
Fax: (312) 527-0484

*Of Counsel*
Barbara Olshanksy (BO3635)
Gitanjali S. Gutierrez (GG1234)
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464
Fax: (212) 614-6499

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Petitioner's Response To Respondents'

Emergency Motion For Procedures Related To Review Of Certain Detainee Materials was

served upon the following person by electronic filing and e-mail on the 20th day of July, 2006:

> Andrew I. Warden (andrew.warden@usdoj.gov)
> Preeya M. Noronha (preeya.noronha@usdoj.gov)
> Civil Division
> Federal Programs Branch
> 20 Massachusetts Ave., NW
> Washington, DC  20530

> /s/ David W. DeBruin